# EXHIBIT 1

# CONTACT CENTER
# MASTER SERVICES AGREEMENT

THIS MASTER SERVICES AGREEMENT (this "**Agreement**") is entered into as of July 29, 2013, (the "**Effective Date**"), by and between AliphCom, a corporation duly organized and existing by and under the laws of California and doing business as Jawbone ("**Jawbone**") and NexRep, LLC, a Delaware corporation with offices located at 465 Congress Street, Suite 700, Portland, Maine 04021, ("**Vendor**").

WHEREAS the parties wish to enter into an agreement pursuant to which Vendor will provide services to Jawbone as specified in one or more Statements of Work (each an "**SOW**") and Jawbone will subscribe for and receive such services, all in accordance with the terms and conditions set forth in this Agreement.

NOW THEREFORE, in consideration of the mutual agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, agree as follows:

## 1. Definitions.

a) "**Applicable Laws**" means all statutes, codes, ordinances, decrees, rules, regulations, municipal by-laws, judicial or regulatory provisions, judgments, orders, rulings or any such provisions binding on the person referred to in the context in which such word is used.

b) "**Charges**" shall mean the amounts set forth in a SOW as charges for the Services.

c) "**End User**" means any person using or accessing the Services by or through Jawbone such as Jawbone's customers, agents, and employees.

d) "**including**" means, whether or not capitalized, including without limitation.

e) "**Services**" means the services provided by Vendor to Jawbone as further described in Section 2 of this Agreement.

f) "**Regulatory Fees**" shall include, but is not limited to, fees required or permitted by governmental authorities or applicable law in support of any statutory or regulatory programs, established by legislation or under the laws of any national, federal, provincial, state or other governmental authority now in force or enacted in the future with respect to the supply of the Services provided by Vendor under this Agreement. Regulatory Fees shall be in addition to, but shall not include Taxes.

g) "**Taxes**" means any and all applicable national, federal, provincial, state, municipal, local or other governmental authority taxes and fees including without limitation, all sales, use, excise, personal property, utility, goods, services, value-added, gross

receipts, and franchise taxes, now in force or enacted in the future with respect to the supply of the Services provided by Vendor under this Agreement, provided however, that in no event shall Taxes include taxes on net income or capital. Taxes shall be in addition to, but shall not include Regulatory Fees.

**2. Statements of Work.**

a.  Vendor will provide to Jawbone the services as described in one or more SOWs executed by both parties (the "**Services**"). Each SOW issued under this Agreement shall be governed by and construed in accordance with the terms and conditions of this Agreement, and each SOW shall be deemed to incorporate the terms and conditions of this Agreement. To the extent of any conflict or inconsistency between the terms and conditions of an SOW and the terms and conditions of this Agreement, the terms and conditions of the SOW shall prevail to the extent of the conflict or inconsistency. SOWs are intended to describe, among other things, the products or services of Jawbone to be supported by Vendor as part of the Services, the scope and specifications of Vendor's Services, service location, service levels, training requirements, reporting requirements, Charges, Taxes, any country-specific terms and conditions including country-specific tax terms and requirements, term and any assumptions or dependencies which govern the performance of the Services.

b.  The Services include the services, functions, and responsibilities expressly described in each SOW as well as: (i) any incidental services, functions, or responsibilities not specifically listed, but which are required for the proper performance and delivery of the Services , (ii) any process and quality improvements recommended by Vendor in the normal course from time-to-time and as approved by Jawbone, and (iii) reasonable cooperation with Jawbone and without limiting clause 3c., any third party appointed by Jawbone in connection with the Services, including without limitation any over-flow or alternative contact center operation.

c.  Vendor may not subcontract any part of the Services that are Jawbone or End User facing or require access to Jawbone or End User data without Jawbone's prior written consent under the applicable SOW. Vendor will be responsible for its subcontractors' and all of its and their employees', agents', and representatives' acts or omissions in relation to the performance of the Services and the confidentiality, access and use restrictions of Jawbone End User and Product Data. Vendor may not relocate or reallocate the place where Services are performed without Jawbone's prior written agreement.

d.  Any changes to an SOW agreed by the parties must be in writing signed by both parties "(Change Order)". If a Change Order requested by Jawbone is related to a material increase or change in Vendor's staffing or transmission facilities, the signed Change Order must be in place a minimum of fifteen (15) days in advance of implementation. Vendor will use commercially reasonable efforts to accommodate changes on a more expedited basis as and if reasonably requested by Jawbone. Vendor may not unreasonably refuse to agree to any Change Order, provided such change would not result in Vendor or its affiliates breaching Applicable Laws and all changes impacting the fees or costs will be reasonably priced as agreed by the parties.

e.  The SOW will describe any responsibilities of Jawbone in connection with the provision of the Services, including training materials and scripting. Without limiting

Jawbone's responsibilities set forth in the SOW, Jawbone shall supply Vendor with product literature, copies of relevant Jawbone information, Jawbone guidelines and procedures and other material required to support the Services as reasonably requested by Vendor.

### 3. Term and Termination/Expiration Assistance.

a. The initial term of this Agreement commences on the Effective Date and will continue for a period of three (3) years thereafter (the "**Initial Term**") unless sooner terminated in the manner provided in this Agreement. The Initial Term may be extended at Jawbone's option for up to two (2) years on the same terms, conditions, and pricing (as adjusted for changes in inflation as described in the applicable SOW) by Jawbone providing Vendor with written notice not less than sixty (60) days prior to the expiry of the Initial Term. Thereafter, any extensions require mutual written agreement of the parties. Notwithstanding the foregoing: (i) the Initial Term of this Agreement will be extended automatically for so long as any SOW remains in effect, and (ii) whether or not documented in writing by Vendor and Jawbone, if any SOW expires and Vendor continues to provide such Services on a temporary basis at the request of Jawbone, then the term of such SOW shall be deemed extended for such temporary period until: (iii) Vendor or Jawbone provides written notice to terminate the Services with at least 60 days prior written notice, or (iv) a new or amended SOW is executed (the Initial Term together with any extended term being called the "**Term**").

b. Following any expiration or termination of this Agreement or any SOW, other than a termination under clause 4c by Vendor for a failure by Jawbone to pay undisputed amounts owing for Services delivered, Vendor will provide Jawbone (and/or its designated third parties) termination/expiration assistance services ("**TAS**"), including (i) the continuation of all or a part of the Services then being provided by Vendor, to the extent Jawbone requests such Services during the TAS Period; (ii) cooperation with Jawbone or subject to clause 3c another service provider designated by Jawbone, in the transfer of the Services to Jawbone or such other service provider in order to facilitate the transfer of the Services to Jawbone or such other service provider, including the provision of training materials, scripts and information relating to the Services (e.g., historical contact volumes, Service Level and KPI statistics) and the return of all Jawbone End User and Product Data; and (iii) any services requested by Jawbone in order to facilitate the transfer of the Services to Jawbone or another service provider designated by Jawbone. The TAS Period means the period commencing upon notice of termination or non-renewal and continuing for up to six (6) months following the effective date of termination or expiration. TAS will be priced at the normal rates set forth in the expiring or terminated SOW; provided, however, (x) if Jawbone requests TAS which are in addition to the Services being provided by Vendor at the time of termination or expiry and such TAS cannot be provided using the staffing resources assigned to Jawbone's account as of the date of termination or expiry, the incremental TAS will be billable at Vendor's then current time and materials rates which are reasonable and generally applicable to Vendor's non-government corporate customers with substantially similar type of services, term commitments to Vendor, geographic location and service terms as Jawbone , and (y) if Jawbone is terminating due to Vendor's material breach or failure to perform in accordance with the KPIs as permitted under this Agreement, then no TAS Charges will apply for the incremental costs of transitioning. In the event of a termination under clause 4c by Vendor in which Jawbone disputes Vendor's right to terminate under such clause and Jawbone agrees to pay Vendor month-to-month in

advance for TAS, Vendor will provide TAS notwithstanding the exception above. This clause 3b survives any termination or expiration.

c. For clarity Vendor's obligation to cooperate with another service provider or third party pursuant to this Section 3 shall not: (i) require Vendor to provide such provider or third party with access to any Vendor Confidential Information; and (ii) be construed so as to create any obligation enforceable by the provider or third party against Vendor, and in this regard Vendor's obligation shall be solely and exclusively to Jawbone.

### 4. Termination.

a. Termination for Convenience. Jawbone may terminate this Agreement or an SOW for convenience for any reason, or for no reason by providing Vendor with thirty (30) days prior written to notice.

b. Termination for Vendor's Breach. Jawbone may terminate this Agreement or an SOW, in whole or in part, by providing written notice to Vendor: (i) if Vendor fails to cure a material breach of this Agreement or the SOW, as applicable, within thirty (30) days after receiving written notice of breach; (ii) if Vendor commits a material breach of this Agreement or the SOW, as applicable, and such breach is not curable; (iii) if Vendor repeatedly fails to comply more than twice with the Service Levels and KPIs under a SOW; (iv) Vendor fails to meet a go-live date for Services specified in an SOW and such failure is not attributable to Jawbone or its third party suppliers and Jawbone provides notice of termination within 5 (five) business days of the failed go-live date; or (v) if Vendor does not comply with applicable disaster recovery and business continuity plans as required under this Agreement. The notice of termination shall include a reasonably detailed description of the breach and/or reasons for termination. For clarity, if Vendor commits multiple breaches of this Agreement or one or more SOWs, as applicable, and such breaches are collectively material, Vendor will be deemed to have committed a material breach of this Agreement or the SOW, as applicable, for the purposes of clause (i).

c. Termination for Non-Payment or Breach of Confidentiality By Jawbone. Vendor may terminate this Agreement in whole or in part (including any SOWs relating to such non-payment or all SOWs) on written notice upon Jawbone's failure to pay undisputed Charges and such failure continues for thirty (30) days after written notice of late payment and Vendor's intent to terminate has been given and provided Jawbone. Vendor may terminate this Agreement (including an applicable SOW) on written notice where Jawbone has materially breached its obligation unless Jawbone (i) timely cures such breach, if curable, (ii) uses commercially reasonable efforts to mitigate the impact thereof, and (iii) implements appropriate safeguard reasonably acceptable to Vendor to prevent the reoccurrence of the same or similar breach.

d. Nothing in this section 4 (including section 4(c)) shall in any way limit either party's right to make any claim or take any legal action against the other party in respect of any loss suffered by a party as a result of the other party's breach of its obligation of confidentiality or otherwise under this Agreement.

e. Termination for Insolvency. Either party may terminate this Agreement and all SOWs on written notice to the other party if such other party is subject to a

voluntary or involuntary liquidation, dissolution, receivership, bankruptcy or other similar proceedings, is insolvent or makes an assignment for the benefit of creditors; provided, however, Vendor may not terminate under this clause 4d if Jawbone is paying month-to-month in advance for the Services.

  f. Upon termination, Jawbone shall pay Vendor all undisputed and unpaid Charges for Services delivered.

**5. Payment Terms.**

  a. Vendor will invoice Jawbone in arrears for, and Jawbone shall pay, all undisputed Charges specified in the SOWs and elsewhere in this Agreement and all applicable Taxes or Regulatory Fees relating to the Services. Recurring Charges will be invoiced monthly in arrears for the term of the SOW starting upon commencement of the applicable Services, unless otherwise agreed. Non-recurring Charges will be invoiced as and when such charges are incurred by Vendor, unless otherwise set forth in the SOW. Payment in full, without deduction or set off, of the amounts in each invoice is due forty-five (45) days following receipt of the invoice. All undisputed Charges not paid by the due date will be assessed late payment charges at the lesser of the rate shown on the invoice or one percent (1%) per month (the "**Interest Rate**"). Any Charges not timely invoiced within 180 days of the date in which such Charges should have been invoiced (the "**Stale Invoice Grace Period**") shall be deemed stale Charges and not subject to payment by Jawbone, unless (i) Vendor provided Jawbone advance notice of any amounts that were not ready to be invoiced but which Jawbone should budget or accrue for prior to the expiration of such Stale Invoice Grace Period, or (ii) such failure to timely invoice arose from Jawbone's failure to provide Vendor sufficient information to fully and timely invoice. For greater clarity, the Stale Invoice Grace Period requirement applies to Charges only and excludes Taxes and Regulatory Fees.

  b. Vendor will maintain the reports and records described in the SOW. A copy of such information will be sent to Jawbone's billing contact at least monthly. As reasonably requested by Jawbone or its auditors, Jawbone may inspect and verify such information, but Jawbone is under no duty to do so. If it is determined that Vendor overcharged Jawbone, then Vendor shall refund to Jawbone the amount of the overcharge, plus interest at the Interest Rate. If it is determined that Vendor undercharged Jawbone, then Vendor shall invoice Jawbone the amount of the undercharge, subject to the Stale Invoice Grace Period unless such undercharge arose due to Jawbone's failure to provide Vendor sufficient information to fully and timely invoice. If overcharges exceed 5% of the Charges in a month, Vendor shall also reimburse Jawbone the reasonable cost of the audit or investigation.

  c. In the event of a good faith dispute as to the calculation of a Charge, an invoice or payment amount, Jawbone shall use commercially reasonable efforts to give written notice to Vendor within thirty (30) days following receipt of the applicable invoice stating the details of any such dispute which Jawbone is aware. If Jawbone asserts a good faith billing dispute related to a particular invoice, Jawbone shall pay when due all undisputed portions of the invoice, and the parties shall use all commercially reasonable efforts to resolve such dispute as expeditiously as possible. The acceptance by Vendor of a partial payment shall not constitute a waiver of payment in full by Vendor of the disputed amount. Jawbone's payment of any Charge or invoice

shall not prejudice Jawbone's right to recover any overcharges that arose from Vendor's failure to maintain accurate reports or records or properly invoice.

**6. Taxes and Regulatory Fees.**

    a.     Charges specified in the SOW are exclusive of Tax and Regulatory Fees.

    b.     Vendor will separately itemize all Taxes and Regulatory Fees on the invoice unless otherwise specified or required by Applicable Law to be included in the Charges. Taxes and Regulatory Fees shall be payable by Jawbone at the same time as all other charges set forth on the invoice.

    c.     Unless Jawbone provides Vendor with a valid tax or regulatory exemption certificate that is received by Vendor in a timely manner prior to issuance of the invoice, Jawbone will pay or reimburse Vendor for Taxes or Regulatory Fees which are payable by Jawbone to any taxing or regulatory authority under Applicable Laws arising from acquisition of the Services, when invoiced by Vendor. The Jawbone's obligations pursuant to this clause 6c shall survive any termination of this Agreement.

    d.     Vendor will specify any applicable tax registration numbers and any other information required under Applicable Laws on the invoices and related documentation.

    e.     Vendor shall not be required to honor or comply with any Tax or Regulatory Fee exemption prior to the receipt of a valid and acceptable Tax or Regulatory Fee exemption certificate or other appropriate documentation issued by the applicable tax or government authority.

    f.     If Jawbone claims a Tax or Regulatory Fee exemption and Vendor relies on such exemption and does not collect the Tax or Regulatory Fee, and such certificate or other reliance by Vendor is subsequently found to be invalid by a tax or government authority, then Jawbone shall hold Vendor harmless from and against any and all assessments for such Tax or Regulatory Fee levied on Vendor, and Jawbone shall be liable for any uncollected Tax or Regulatory Fee, as well as any and all late charges, penalties or interest assessed thereon by any tax or government authority.

    g.     If Jawbone pays a Tax or Regulatory Fee to Vendor and Vendor fails to timely remit such amount to the proper authority, then Vendor (and its affiliates) shall defend, indemnify and hold Jawbone and its affiliates, officers, directors, employees, shareholders, successors, and assigns harmless from and against any and all assessments for such Tax or Regulatory Fee, and Vendor (and its affiliates) shall be liable for such Tax or Regulatory Fee, as well as any and all late charges, penalties or interest assessed thereon by any tax or government authority. If Vendor fails to timely or accurately invoice for a Tax or Regulatory Fee, then Vendor (and its affiliates) shall defend, indemnify and hold Jawbone and its affiliates, officers, directors, employees, shareholders, successors, and assigns harmless from and against any and all late charges, penalties or interest assessed thereon by any tax or government authority.

7. **Personnel**.

(a) **Hiring**. Vendor shall not hire, retain or engage officers, employees or agents or third-party contractors or subcontractors having officers or employees (each, a "Worker" and, collectively, the "Workers"), who have been convicted of a felony or a misdemeanor involving theft, fraud, passing bad checks, or any similar crime.

(b) **Background Checks; Employment Verification**

(i) Prior to assigning any Worker to provide Services to Jawbone hereunder, Vendor shall complete a criminal background investigation in the counties of residence of such Worker for the past seven (7) years ("Counties of Residence"). Such investigation shall (i) be conducted by Vendor using the applicable Worker's provided name and any aliases (e.g., maiden names) identified by Vendor through the social security verification process described in Section 3(b)(ii) below and (ii) search all records of (x) all courts (including, without limitation, federal courts, superior courts, and municipal courts) located in the Counties of Residence and (y) the Office of Foreign Asset Control. Vendor agrees that no Worker who has a felony conviction will be used to provide Offerings to Jawbone hereunder.

(ii) Prior to assigning any Worker to provide Services to Jawbone hereunder, Vendor shall verify the Worker's legal right to work in the United States or Canada as applicable.

(iii) Vendor shall, and shall cause its third-party contractors and subcontractors to, maintain, during the Term and any TAS, if any, and for a period of at least three (3) years thereafter, complete and accurate records of all criminal background investigations and SSN verifications conducted by Vendor pursuant to this Section.

(iv) In cases of fraud or suspected fraud, Vendor shall allow (if not prevented by law or injunction) and authorize Jawbone to access any background investigation documentation regarding its Workers that Jawbone deems reasonably necessary.

8. **Disclaimer.**

Vendor represents and warrants:

(a) That the services will conform with the descriptions as set forth in the applicable sow.

(b) That it has all requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement and each SOW;

(c) That the execution, delivery and performance of the Agreement and each SOW has been duly authorized by Vendor;

(d) That there is no outstanding litigation, arbitrated matter or other dispute to which Vendor (or its affiliates) is a party which would reasonably be expected to have a

potential or actual material adverse effect on Vendor ability to fulfill its respective obligations under the Agreement;

(e) That it is duly licensed, authorized or qualified to do business and is in good standing in every jurisdiction in which a license, authorization or qualification is required for the ownership or leasing of its assets or the transaction of business of the character transacted by it, except where the failure to be so licensed, authorized or qualified would not have a material adverse effect on Vendor' ability to fulfill its obligations under this Agreement and each SOW;

(f) That it has not, directly or indirectly, given and will not give, or permit to be given by its representatives, any commissions, payments, kickbacks, lavish or extensive entertainment, or other inducements of more than minimal value or otherwise in violation of Applicable Laws;

(g) That it will comply with (i) all Applicable Laws for its business and the Services, including those laws and regulations relating to call recording, (ii) payment card industry data security ("**PCI**") standards published by the PCI Security Standards Council, as the PCI standards may be amended, supplemented or replaced from time to time during the term of this Agreement, and (iii) Jawbone's instructions and policies with respect to Applicable Laws for Jawbone's business;

(h) That it has and will maintain an adequate capacity of qualified personnel and resources to perform the Services and its other obligations, subject to any capacity or other limitations and customer failures excusing Vendor's performance as each are expressly described in a SOW and provided that Vendor uses commercially reasonable efforts to perform notwithstanding such limitation or failure to the extent reasonably practical under the circumstances;

(i) That it will perform the Services in a diligent, efficient, professional, and workmanlike manner with due care and skill;

(j) That it will use commercially reasonable efforts to recommend and, subject to the parties mutually agreeing on and executing any applicable Change Order implement, process and technology improvements to continuously improve the quality and efficiency of the Services and End User satisfaction in accordance with leading industry standards;

(k) That none of the Services, systems, resources, documents or materials in connection with the Services under this Agreement which it uses, provides or develops will infringe upon the proprietary rights of any third party (except such infringements as may result from strict compliance with Jawbone's specifications or modifications made by Jawbone);

(l) That any deliverables, documents or materials that Vendor develops will conform in all material respects to the requirements and acceptance criteria, if any, described in the SOW or otherwise agreed in writing by the parties (e.g., a document that describes the functional or technical requirements of a software interface deliverable).

(m) That it has performed the background checks and investigations required under Section 7 of this Agreement, will do so at all times during the Term of the Agreement, and that all persons providing directly, or indirectly Services to Jawbone have passed the requirements of Section 7.

VENDOR DOES NOT WARRANT THAT THE SERVICES WILL ADDRESS OR SATISFY ALL BUSINESS REQUIREMENTS OF THE CUSTOMER, ITS CUSTOMERS OR END USERS. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT ALL SERVICES ARE PROVIDED ON "AS IS" BASIS. EACH PARTY EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, WHETHER ARISING BY STATUTE, LAW, COURSE OF DEALING, CUSTOM AND PRACTICE OR TRADE USAGE.

**9. Limitation and Exclusion of Liability.**

a. EXCEPT AS OTHERWISE PROVIDED BELOW IN CLAUSE 9c AND EXCEPT FOR CUSTOMER'S LIABILITY TO PAY CHARGES FOR SERVICES PROVIDED UNDER THIS AGREEMENT, THE AGGREGATE LIABILITY OF VENDOR AND CUSTOMER AND ITS AFFILIATES RELATED TO THIS AGREEMENT, ALL SOWS AND THE SERVICES, FOR ANY CAUSE WHATSOEVER, INCLUDING DAMAGES ARISING FROM A BREACH OF THIS AGREEMENT (INCLUDING A FUNDAMENTAL BREACH OR OTHERWISE), NEGLIGENCE, ANY ACT OR OMISSION BY A PARTY OR ITS REPRESENTATIVES OR UNDER ANY OTHER THEORY OF LAW OR EQUITY WILL BE LIMITED TO AN AMOUNT EQUAL TO THREE TIMES THE MONTHLY CHARGES PAID BY CUSTOMER TO VENDOR AND ITS AFFILIATES UNDER THIS AGREEMENT DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEEDING THE FIRST EVENT OR MATTER THAT GAVE RISE TO THE CLAIM OR THIRTY-SIX (36) TIMES THE THEN CURRENT MONTHLY CHARGES PAID BY CUSTOMER IF THE CLAIM OCCURS IN THE FIRST TWELVE (12) MONTHS OF THE TERM OF THIS AGREEMENT.

b. EXCEPT AS OTHERWISE PROVIDED BELOW IN CLAUSE 9c, IN NO EVENT WILL EITHER PARTY BE LIABLE FOR ANY DAMAGES FOR LOSS OF PROFITS OR BUSINESS, LOSS OF OR DAMAGE TO DATA, LOSS OF GOODWILL, FAILURE TO REALIZE EXPECTED COST SAVINGS OR FOR ANY PUNITIVE, CONSEQUENTIAL, INCIDENTAL OR INDIRECT DAMAGES RELATED TO THIS AGREEMENT OR THE USE OF OR INABILITY TO USE THE SERVICES, EVEN IF THE PARTY COULD REASONABLY FORESEE OR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

c. The foregoing limitations and exclusions of damages will not apply with respect to: (i) Losses occasioned by the willful misconduct, fraud, or gross negligence; (ii) Losses with respect to third party claims that are the subject of indemnification under clause 12; (iii) Losses occasioned by Vendor's wrongful termination, intentional abandonment of the Services, or willful refusal to provide the Services or TAS (which for clarity does not include a cessation of Services by Vendor pursuant to Sections 4c, 4d or 11c); or (iv) Losses occasioned by any breach of confidentiality or privacy related obligations under this Agreement. The exclusions of damages in clause 9b. will not

apply with respect to any Losses occasioned by any breach of security or PCI requirements and the aggregate liability for any such Losses will not exceed the greater of 1.5 times the cap set out in clause 9a or $3,000,000 (the "**Enhanced Cap**"); provided, however, if one of the exclusions in 9c.(i), (ii), (iii), or (iv) apply, then such Losses will not be subject to the Enhanced Cap or the cap set out in clause 9a.

**10. Proprietary Materials and End User Distribution.**

a. If Vendor conceives, authors, develops, or creates, in whole or in part, any materials, information, or data exclusively for Jawbone (including Jawbone specific scripts, forecasting tools, training materials, manuals, databases and knowledge bases) ("**Developed Materials**"), then such Developed Materials shall be a work made for hire and exclusively owned by Jawbone. Copies of Developed Materials will be provided to Jawbone upon request and as part of TAS. If any such Developed Materials may not be considered a work made for hire under applicable laws, Vendor hereby irrevocably assigns, and will assign, to Jawbone without further consideration, all of Vendor's right, title and interest in and to such Developed Materials. Vendor acknowledges that Jawbone and the successors and assigns of Jawbone will have the right to obtain and hold in their own name any intellectual property rights in and to such Developed Materials. Vendor agrees to execute any documents and take any other actions reasonably requested by Jawbone to effectuate the purposes of this clause. Jawbone grants to Vendor a non-exclusive, non-transferable, worldwide, limited right and license to use, execute, reproduce, display, perform, modify and distribute the Developed Materials for the sole purpose of providing the Services during the Term and any TAS Period. Jawbone may, in its sole discretion and upon such terms and at such prices as Jawbone and Vendor may agree, grant Vendor a license to use the Developed Materials for other purposes and to sublicense such Developed Materials. Notwithstanding the foregoing, derivative works or enhancements of Vendor's pre-existing materials created by Vendor in connection with the delivery of the Services or related to the Developed Materials will be owned by Vendor, unless otherwise agreed. Vendor hereby grants to Jawbone a worldwide, non-exclusive, non-assignable and non-sub licensable fully paid-up license, to use, execute, reproduce, display, perform, modify, enhance, distribute and create derivative works and enhancements of, such Vendor owned materials for the benefit and use of Jawbone and its affiliates for the sole purposes of receiving the Services during the Term and any TAS period. In addition with respect to any Vendor's owned materials (or derivative works or enhancements thereof customized for Jawbone) which are embedded or incorporated in any Developed Materials (e.g., any scripts or processes created for Jawbone that include certain Vendor pre-existing materials), Vendor hereby grants to Jawbone a worldwide, perpetual, irrevocable, non-exclusive, fully paid-up license, with the right to grant sublicenses, to use, execute, reproduce, display, perform, modify, enhance, distribute and create derivative works and enhancements of, such Vendor owned materials for the benefit and use of Jawbone and its affiliates.

b. Except for Developed Materials and other materials, information, data, and intellectual property or items furnished by Jawbone or specifically related to Jawbone's business, products, and End Users and except as provided otherwise in this Agreement or an SOW, all software, hardware, tools, applications, databases, knowledge bases, systems, methodologies, processes, techniques and know-how used by Vendor in performing the Services, and all improvements, enhancements and

modifications made thereto, shall be and remain the sole and exclusive property of Vendor or its licensors.

c. Unless otherwise agreed upon by both parties in writing, each party shall retain all of its own intellectual property rights in any computer software, programs and associated documents supplied by it and any developments made thereto during the course of this Agreement. Additionally, Jawbone retains ownership of its own customer lists, any data or information specifically identifying its customers or End Users, and any written, electronic or audio records of communications with such customers or End Users ("**Jawbone End User and Product Data**"). Vendor may only use Jawbone End User and Product Data to provide the Services.

d. Neither party shall use any trade-mark, brand name, copyright, patent, or any other intellectual property of the other party or its respective affiliates without the other party's prior written consent or as authorized under this Agreement. Jawbone's and Vendor's name and the names of its affiliates are proprietary and nothing herein constitutes a license authorizing their use.

### 11. Confidentiality and Data Security.

a. For the purposes of this section 11, "**Confidential Information**" means:

(i) in the case of each party, information concerning such party's or its affiliates' owned or licensed software and documentation, applications, designs, methodologies, techniques, processes, information and technology systems, global network infrastructure and related capabilities, patents, patent applications, intellectual property, financial and accounting data, cost and pricing information, market projections and analyses, strategies, business or product plans, business activities, research and development, products, product design, performance specifications, schematics, contract terms, customer lists, and identity of and information relating to prospective or existing customers, suppliers and vendors, whether or not such information is marked as confidential or proprietary;

(ii) in the case of Jawbone, Jawbone End User and Product Data; and

(iii) other proprietary and confidential information of a party which it marks as confidential.

Without limiting the generality of the foregoing, the terms of this Agreement and all SOWs is Confidential Information of Vendor and Jawbone, respectively.

The parties agree (i) not to disclose or make each other's Confidential Information available in any form to a third party or to use each other's Confidential Information for any purpose other than as necessary to perform its obligations under this Agreement, exercise its rights under this Agreement, and (ii) to restrict disclosure of the Confidential Information of the other party to the party's employees, agents, subcontractors, consultants and professional advisors on a need to know basis.

Each party agrees to take all commercially reasonable steps to ensure that Confidential Information is not disclosed or distributed by it or its employees, agents, subcontractors, consultants or professional advisors in violation of this Agreement. As reasonably requested by Jawbone, Vendor will require its employees, agents, subcontractors,

consultants or professional advisors who have access to sensitive Jawbone Confidential Information to execute a non-disclosure agreement directly with Jawbone with terms and conditions that are not inconsistent with Vendor's policies.

Upon the termination or expiry of this Agreement:

(iii) each party shall destroy and certify such destruction if requested by the disclosing party or return to the other party all of the other party's Confidential Information in its possession or control, regardless of whether the Confidential Information is in written, graphics or machine-readable form; and

(iv) Vendor may destroy or erase Jawbone's Confidential Information if Jawbone has not provided Vendor with written direction to return or destroy such information within 60 days of a request by Vendor for direction.

The obligations of nondisclosure and nonuse set forth above in this section 11 will survive the expiration or termination of this Agreement for a period of three (3) years or as required by Applicable Law in connection with personal or private information relating to End Users.

b. Except with respect to personal or private information relating to End Users, neither party shall have any liability for the use or disclosure of any information that: (i) is publicly known at the time of its receipt; (ii) has entered the public domain through no action or failure to act of the receiving party; (iii) prior to disclosure hereunder was already lawfully in the receiving party's possession without any obligation of confidentiality as evidenced by the written records of the receiving party; (iv) subsequent to disclosure hereunder is obtained by the receiving party on a non-confidential basis from a third party who is not bound by an obligation of confidentiality with respect to the information disclosed; (v) is independently developed by the receiving party without use of, or reference to, the other party's Confidential Information as evidenced by the written records of the receiving party.

c. In the event Confidential information is required to be disclosed pursuant to Applicable Law or court order or to a governmental agency having jurisdiction, provided that in such case the receiving party will to the extent legally permissible and practically possible provide the other party with notice of the required disclosure so that the other party may take steps to resist or limit the disclosure and to maintain confidentiality by the court or administrative body and will cooperate with the disclosing party in seeking such protection. The receiving party will make the minimum disclosure necessary to comply with any such compelled disclosure. Except for the compelled disclousure to a court or governmental agency, receiving party will not otherwise be relieved of its obligations to protect the disclosing party's Confidential Information.

d. Vendor will comply with all Applicable Law applicable to Vendor's business operations of those jurisdictions where Vendor operates contact centers used to provide the Services, all federal laws and regulations, PCI requirements, and call recording laws and regulations generally applicable to call center operations in North America (collectively, "**Vendor Applicable Law**"). Jawbone will be responsible for communicating to Vendor any legal or regulatory compliance requirements (including any privacy requirements related to the personal information of Jawbone's customers) arising from jurisdictions where Jawbone's customers are located which are related to the Services or to Vendor's interactions with Jawbone's customers) to the extent such compliance

requirements differ from those which are Vendor Applicable Law ("**Jawbone Applicable Law**"). Jawbone will include its requirements relating to Jawbone Applicable Law as part of the training program developed for Vendor's agents and Vendor will cause its agents to comply with such requirements.

Vendor's access to Jawbone's systems and networks will be subject to mutually agreed protocols as set forth in a SOW or otherwise agreed by the parties. Any additional obligations of Vendor related to the collection, storage, handling, disclosure or destruction of personal information of Jawbone's customers and End Users will be set out in the applicable SOW.

  e. If Vendor suspects, discovers or is notified of any actual or potential unauthorized access or use of Jawbone Confidential Information (including Jawbone End User and Product Data) created or received by Vendor in connection with the Services, Vendor will promptly notify Jawbone of such event or circumstance as soon as reasonably possible (and in all cases within a timeframe that is consistent with Applicable Law). In addition, Vendor will promptly investigate and where the unauthorized use is the result of actions or omissions by Vendor (or Vendor's employees, Vendor's affiliates or subcontractors, or any of their employees or representatives) or relates to Vendor's facilities, systems or tools, take reasonable steps to cure any event or circumstance giving rise to such actual or potential unauthorized access or use, provide a root cause analysis to Jawbone and take reasonable measures to prevent such event or circumstance from occurring in the future.

  f. If any disclosure, use or breach of any Jawbone End User and Product Data arising out of the Services or any acts or omissions of Vendor, Vendor's employees, Vendor's affiliates or subcontractors, or any of their employees or representatives requires Jawbone, under Applicable Laws, to make a disclosure to any third party, Jawbone will be solely responsible for making such disclosure, including determining the content, methods, and means of such disclosure. Vendor will reasonably cooperate with Jawbone in formulating the disclosure, but Vendor will not make any such disclosure at its own initiative without Jawbone's prior consent, unless required under Applicable Laws, in which event it will notify Jawbone before disclosing. To the extent the foregoing is caused by or related to a breach of this Agreement for which Vendor is responsible, Vendor will pay all reasonable costs and expenses of: (a) such disclosures and notification, and (b) monitoring and reporting on the impacted individuals' or entities' credit records, as and if required. This clause 11f survives any termination or expiration of this Agreement.

## 12. Indemnification.

  a. Vendor is responsible and shall defend, indemnify and hold harmless Jawbone and its affiliates and their officers, directors, shareholders, successors and assigns (each an "**Indemnified Party**") from and against, any and all claims, actions, judgments, costs, damages, expenses, losses or liabilities (including reasonable legal fees and court costs) (collectively, "**Losses**") incurred or suffered by an Indemnified Party for: (i) a third party Claim arising out of or relating in any way to a breach of this Agreement or an SOW by Vendor, Vendor's affiliates or subcontractors, or any of their employees or representatives, including representations and warranties; (ii) a third party Claim arising out of or relating in any way to a breach of this Agreement by Vendor, Vendor's affiliates or subcontractors, or any of their employees or representatives, (iii) a

Claim arising out of or relating in any way to the Services or the Agreement brought by Vendor personnel, Vendor affiliates, Vendor subcontractors, or their personnel; (iv) a Claim arising out of or related in any way to Vendor's (or its affiliates' or subcontractors') interview, hiring and/or personnel processes or claims arising out of their employer-employee relationships, including any co-employment claims or claims for wages, benefits, or taxes relating to such individuals; (v) a Claim for personal injury, death, or property damage arising from acts or omissions occurring at or near Vendor's facilities or due to Vendor's or its agents' wrongful acts or omissions; or (vi) a Claim arising from gross negligence or willful misconduct, in connection with the performance of the Services by Vendor, Vendor's affiliates or subcontractors, or any of their employees or representatives. In all cases above, Vendor's foregoing indemnification obligations in this Section 12a shall be excused to the extent the Claim arises from the Indemnified Party's wrongful acts or omissions.

  b. Jawbone is responsible and shall indemnify Vendor and its affiliates and their officers, directors, shareholders, successors and assigns (each a "**Vendor Indemnified Party**") for, and save each Vendor Indemnified Party harmless from and against, any and all Losses incurred or suffered by a Vendor Indemnified Party for a third party Claim arising out of or relating in any way to: (i) the resale or modification of the Services by or on behalf of Jawbone contrary to the terms of this Agreement and not recommended or authorized by Vendor; and (ii) any claim by an End User related to the Services, this Agreement or an SOW, except to the extent arising from Vendor's or its agents' failure to comply with this Agreement or any SOW or such claim is subject to indemnification by Vendor under another provision of this Agreement.

  c. Vendor will have the obligation to defend any action, claim, suit or proceeding brought against Jawbone so far as it is based on a claim that any Services or Developed Materials infringe or misappropriate the intellectual property rights of a third party, including a trademark, trade secret, copyright, or patent, and Vendor shall indemnify Jawbone against a judgment entered in such a claim, suit or proceeding by a court of competent jurisdiction and against a settlement arising out of such claim, suit or proceeding. Notwithstanding the foregoing, Vendor shall have no liability for the Losses under a claim of infringement to the extent arising from: (i) a modification of the Services or Developed Materials not approved or recommended in writing, or made by Vendor or its authorized agents; (ii) use of the Services or Developed Materials by Jawbone, any End User or their respective employees, agents or contractors in combination with Jawbone equipment (or any other devices, equipment, facilities, products, processes, systems or materials not provided, approved, or contemplated by Vendor); or (iii) use of the Services or Developed Materials in contravention of the terms and conditions of this Agreement, but only to the extent such Losses would not have occurred but for such modification, combination, or use described above. If such claim has occurred, or in Vendor's opinion is likely to occur, Vendor may, in its discretion and at its expense, either procure the right to continue to provide the Services or Developed Materials or modify or replace the same so that they become non-infringing.

  d. The obligations of indemnity by a party (an "**Indemnifying Party**") under this clause 12. are subject to the following: (i) the other party shall give the Indemnifying Party prompt written notice of any claim, action, suit or proceeding which is subject to indemnification ("**Claim**") upon becoming aware of same and shall not make any admissions in respect of such Claim; (ii) the other party shall take all steps reasonably requested by the Indemnifying Party, at the Indemnifying Party's expense, to mitigate

any Claim; (iii) the Indemnifying Party shall have the right to control and direct the defense of the Claim, at the Indemnifying Party's expense, but shall keep the other party up to date with respect to the status of the Claim; (iv) the Indemnifying Party shall not settle, compromise or consent to the entry of any judgment relating to such Claim unless the Indemnifying Party has given the other party reasonable prior written notice thereof and such settlement, compromise or consent does not require a payment by the other party or involve an admission of wrongdoing or fault by the other party; and (v) the other party shall fully cooperate, at the Indemnifying Party's expense, in any defense of the Claim by the Indemnifying Party. Failure to comply with this clause 12d shall not excuse the Indemnifying Party from its obligations under this clause 12, unless such failure materially prejudices the Indemnifying Party.

### 13. DR/BCP and Force Majeure.

Vendor will have and maintain disaster recovery and business continuity procedures and plans in place at all times that cover the facilities used to deliver the Services. Vendor will make a copy of its disaster recovery and business continuity plans and procedures available to Jawbone upon request and comply with such plans and procedures in the event of a triggering event. More detailed requirements and testing may be set forth in a SOW or developed after commencement of the Services by mutual agreement.

Excluding payment obligations, a party shall be excused from a delay in performing or a failure to perform under this Agreement or an SOW to the extent that such delay or failure results from any act of God or public enemy, act of any military, civil or regulatory authority, riots, civil disorders, rebellions or revolutions in any country, terrorist acts, threat of terrorism, fire, flood, earthquake, storm or other similar event, disruption or outage of communications, power or other utility, or any other similar cause beyond a party's reasonable control, provided, that any such event or circumstance: (i) could not have been prevented or mitigated through the use of reasonable care and compliance with the affected party's disaster recovery or business continuity procedures and plans, and (ii) was not reasonably foreseeable by the affected party. Upon any force majeure event adversely impacting the performance of the Services as described above, the affected party shall promptly notify the other party and allocate its available resources to recommence Services as quickly as reasonably possible. No Charges shall apply for Services not performed. If a force majeure event lasts for more than seven (7) consecutive days or in the aggregate for more than ten (10) days in any twelve (12) month period, then Jawbone may elect to terminate, in whole or in part, without payment of any termination for convenience fees by providing written notice of termination to Vendor within fourteen (14) days of the date that such termination right was triggered.

### 14. Notices.

Any notices required or permitted under this Agreement or an SOW shall be delivered via overnight courier service, an email PDF or facsimile. Any notice by an email PDF file or facsimile shall be promptly followed by delivery of such notice by an overnight courier service, unless a party waives its rights to receive such additional notice. All notices shall be addressed as follows (or as subsequently updated in writing to the other party):

   <u>Vendor</u>:  NexRep, L.L.C.

   Vendor
   ADDRESS  465 Congress Street, Suite 700,
         Portland, Maine ~~04021~~ 04101
   EMAIL   john@nexrep.com


   <u>Jawbone:</u>

   AliphCom
   99 Rhode Island Street
   3rd Floor
   San Francisco, CA 94103
   Attention: Vice President of Finance c/o Marin Tchakarov
   (or his successor)

   With a copy to:

   AliphCom
   99 Rhode Island Street
   3rd Floor
   San Francisco, CA 94103
   Attention: General Counsel

### 15. Independent Contractors.

The relationship between Vendor and Jawbone is that of independent contractors, not partners or joint venturers. Without restricting the generality of the foregoing, Vendor shall be fully responsible for monitoring its employees and other personnel, their acts and omissions, all employment matters related to its employees. At no time shall any Vendor employee or other personnel be entitled to participate in, or receive any benefit or right under, Jawbone employee plans, including but not limited to, employment insurance, vacation, workers compensation and retirement plans.

### 16. Assignment.

Vendor may not assign this Agreement or any SOW, in whole or in part, without obtaining Jawbone's prior written consent, which consent shall not be unreasonably withheld or delayed. Jawbone may assign this Agreement or an SOW to an affiliate or in connection with a merger, consolidation, reorganization, acquistion, divestiture or sale of all or substantially all of its assets or stock on notice to Vendor and without Vendor'ss consent.


### 16. Enurement.

This Agreement shall enure to the benefit of and be binding upon the parties and their respective successors and permitted assigns.


**CONFIDENTIAL**                           Page 16 of 19

**17. Governing Law And Exclusive Jurisdiction**. This Agreement shall be deemed to be made and entered into pursuant to the internal laws of the State of New York and for all purposes this Agreement shall be construed and interpreted in accordance with and be governed by the law of the State of New York as thought between two residents of New York.

**18. Attorneys Fees**. In any action or proceeding to enforce rights under this Agreement, the prevailing party shall be entitled to recover in addition to any other costs or damages awarded, all costs of litigation, including, but not limited to expert witness' fees and attorneys' fees.

The legal costs and expenses incurred by a party in negotiating and preparing this Agreement shall be borne by the party incurring such costs and expenses.

### 19. Severability.

If any provision of the Agreement shall be held to be invalid, illegal or unenforceable for any reason by a court of competent jurisdiction, such provision shall be severed from the Agreement and the remaining provisions shall continue in full force and effect as if this Agreement had been executed with the invalid, illegal or unenforceable provisions omitted and the parties shall promptly negotiate a replacement.

### 20. Entire Agreement.

This Agreement together with the SOW(s) represents the entire agreement between the parties and supersedes all previous written or oral agreements relating to its subject matter.

### 21. Waiver.

No waiver of a breach of any provision of this Agreement shall have any force or effect unless in writing, signed by the waiving party. No waiver of a breach of any provision of this Agreement shall be deemed to be, or shall constitute, a waiver of a breach of any other provision of this Agreement, whether or not similar, nor shall such waiver constitute a continuing waiver of such breach unless otherwise expressly provided in such waiver.

### 22. Amendment.

This Agreement and any SOW may not be amended or modified other than by written instrument executed by both parties.

### 23. Headings.

Paragraph and section headings used herein are for convenience only and shall not be used for the purposes of interpretation of this Agreement.

### 25. Survival.

Any provisions which by their express or implicit terms are intended to survive the expiration or termination of this Agreement shall so survive the expiration or termination of this Agreement, including duties regarding confidentiality, data security, indemnification, limitations of liability, dispute resolution, TAS.

## 26. Contract Interpretation.

Ambiguities, inconsistencies or conflicts in this Agreement shall not be strictly construed against the drafter of the language but will be resolved by applying the most reasonable interpretation under the circumstances. Where the context of this Agreement so requires, singular terms shall be considered plural and plural terms shall be considered singular.

## 27. Execution.

This Agreement and any SOW may be executed in two or more counterparts and by electronic signature, each of which when so executed and delivered will be considered to be an original, and all of which together will constitute one and the same instrument.

## 28. Language.

In the event of controversy between the parties respecting the interpretation or application of this Agreement, the English language version of this Agreement shall be controlling.

## 29. Audit and Inspection.

In addition to any other provision for financial audits, Jawbone (and its auditors or regulators) may reasonably audit Vendor and its performance of the Services for compliance with this Agreement and Applicable Laws, including the inspection of facilities where the Services are provided. Any such audit undertaken by Jawbone or its auditors during normal business hours will be reasonably designed to not unduly interfere with Vendor's day-to-day operation with respect to other customers. Jawbone will provide Vendor with reasonable advance written notice of a requested audit so that Vendor can arrange to have appropriate personnel available. Jawbone acknowledges that in conducting an audit it will not be entitled have access or view information related to other Vendor customers.

**SIGNATURES ON FOLLOWING PAGE**

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement through their duly authorized representatives effective as of the date first above written.

| VENDOR | ALIPHCOM |
|---|---|
| Signature: *Theodore L* | Signature: *M. Tchakarov* |
| Name: Theodore Linw | Name: MARIN TCHAKAROV |
| Title: CEO | Title: VP FINANCE |